**IN THE UNITED STATES DISTRICT COURT**
**FOR THE MIDDLE DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| **MIDDLETOWN BOROUGH,** | : | **CIVIL ACTION NO. 1:18-CV-861** |
| | : | |
| **Plaintiff** | : | **(Chief Judge Conner)** |
| | : | |
| **v.** | : | |
| | : | |
| **MIDDLETOWN WATER JOINT** | : | |
| **VENTURE LLC,** | : | |
| | : | |
| **Defendant** | : | |

## MEMORANDUM

Plaintiff Middletown Borough ("the Borough") commenced this action seeking reformation of its water and sewer services contract with defendant Middletown Water Joint Venture LLC ("Middletown Water"). The Borough moves the court to preliminarily enjoin imposition of a service charge on its residents pending the outcome of this litigation and a related arbitration proceeding.

## I.    Background

The Borough commenced this action with the filing of a verified complaint in the Court of Common Pleas for Dauphin County, Pennsylvania. In its complaint, the Borough seeks reformation of the parties' lease agreement governing operation of the Borough's water and sewer system. It asserts that the lease agreement's water sales shortfall provisions do not accurately reflect the intent of the parties at the time of contracting. The Borough seeks preliminary injunctive relief pending resolution of its contract reformation claim and the parties' related arbitration proceeding. Middletown Water timely removed the case to federal court.

The court convened a preliminary injunction hearing on May 22, 2018, taking evidence in the form of documentary exhibits and witness testimony. The parties filed proposed findings of fact and conclusions of law in support of their respective positions subsequent to the hearing. With briefing concluded and the record closed, the Borough's motion for preliminary injunction is ripe for disposition. Following the close of the preliminary injunction record, Middletown Water moved to dismiss the Borough's complaint pursuant to Federal Rule of Civil Procedure 12(b)(6). The Borough then filed an amended complaint.

## II. Findings of Fact[1]

Middletown Water is a joint venture comprising SUEZ Water Environmental Services Inc. ("SUEZ") and Argo Infrastructure Partners.[2] (Correll Aff. ¶ 9). SUEZ serves as operator of the wastewater utility system and water plant and distribution

---

[1] Consistent with the directive of Federal Rule of Civil Procedure 65(d), the following factual narrative represents the court's findings of fact as derived from the record. Citations to the record include the transcript of the preliminary injunction hearing convened on May 22, 2018 ("Tr."), exhibits introduced by the Borough ("Boro. Ex.") and Middletown Water ("M.W. Ex."), and affidavits filed on the docket ("[NAME] Aff.").

[2] SUEZ was formerly known as United Water Environmental Services Inc. (Correll Aff. ¶ 9). Argo Infrastructure Partners purchased its interest in Middletown Water from the private equity firm Kohlberg, Kravis, Roberts & Co. LP. (Id.) For clarity, the court will reference SUEZ when discussing any actions taken by either United Water or SUEZ during the contracting process.

system for the Middletown Water project.[3] (Id.; see M.W. Ex. 1 at 49). The Borough and Middletown Water executed a Municipal Water and Wastewater Utility System Concession and Lease Agreement ("lease agreement") naming Middletown Water as concessionaire on September 30, 2014. (M.W. Ex. 1). Article 7 of the lease agreement governs imposition of service charges for water and sewer services. (Id. at 76-79).

The lease agreement prohibits Middletown Water from increasing water and sewer rates prior to January 2019, absent Borough approval, and establishes caps on rate increases permitted thereafter. (Id. at 76-77). Section 7.1(*l*) sets forth one of several exceptions to this prohibition on rate increases and reads as follows:

> (*l*) *Demand Shortfall Recovery.* [Middletown Water] may also impose upon all Retail Water Customers and Retail Sewer Customers a Service Charge in any Demand Shortfall Recovery Year to recover the Annual Shortfall Recovery Amount that may be recovered in that Demand Shortfall Recovery Year, which Service Charge shall be in addition to the Service Charges otherwise imposed under Section 7.1.

(Id. at 76, 78). A demand shortfall recovery year is any of the three years following the final year of a three-year rolling test period—beginning with calendar years 2015-2017—in which there is a water sales shortfall. (Id. at 11, 29). A water sales shortfall occurs when the sum in gallons of (1) "the actual average daily volume of

---

[3] Pertinent to the instant matter, Daniel Standish ("Standish") was the operations supervisor of the Middletown Water project for SUEZ. (Tr. 6:8-11). Water Capital Partners is the administrator of the Middletown Water project, and it represents investors at monthly operations meetings. (Correll Aff. ¶ 9; Tr. 78:5-79:4). Daniel Sugarman ("Sugarman") is managing director at Water Capital Partners. (Tr. 78:5-8).

metered water sales to all Retail Water Customers" over a three-year test period, and (2) the bulk sales surplus over the three-year test period, is less than 639,340 gallons per day. (Id.) A bulk sales surplus is the amount in gallons per day that the "actual average daily volume of metered water sales to all [Middletown bulk customers]" over a three-year test period exceeds 62,970 gallons. (Id. at 6).

When a water sales shortfall occurs, Middletown Water may impose a service charge to recover the annual shortfall recovery amount. (Id. at 25, 78). The annual shortfall recovery amount is one-third of the shortfall recovery amount for a three-year period. (Id. at 4). The water sales shortfall, expressed in gallons per day, is used to calculate the three-year shortfall recovery amount. (Id. at 25). The instant litigation arises out of Middletown Water's invocation of the demand shortfall recovery exception to the lease agreement's restrictions on rate increases.

### A.     Bidding and Contract Negotiations

The Borough participated in Pennsylvania's Early Intervention Program in 2013, which "assist[s] municipalities in addressing long-term financial, operational and economic development issues." (M.W. Ex. 8 at 1; M.W. Ex. 14 at 4). At the time, the Borough grappled with, *inter alia*, a budget deficit of $3.3 million in its general fund and tens of millions of dollars in unfunded pension liabilities. (M.W. Ex. 8 at 1-2; M.W. Ex. 14 at 13; Tr. 34:3-16, 66:20-67:18). Susquehanna Group Advisors, Inc. ("Susquehanna") financially advised the Borough during its participation in the Early Intervention Program. (See M.W. Exs. 8, 14). Susquehanna recommended leasing the Borough's water and sewer system as part of a multi-year plan to address these fiscal issues. (Kapenstein Aff. ¶ 4; see M.W. Ex. 8 at 1; M.W. Ex. 14 at 33;

Tr. 34:7-16, 67:19-68:4).  The Borough agreed and town councilman Benjamin

Kapenstein ("Councilman Kapenstein") supported exploration of leasing the system.

(M.W. Ex. 8 at 1).

The Borough engaged the law firm McNees Wallace & Nurick LLC

("McNees") to administer a competitive procurement process.  (Tr. 30:11-14,

34:21-23, 43:23-44:12; Kapenstein Aff. ¶ 5).  McNees solicited proposals and made a

preliminary draft lease agreement available to prospective bidders in an online data

room on June 13, 2014.  (Tr. 38:12-20; Correll Aff. ¶ 13; Kapenstein Aff. ¶¶ 5, 14; M.W.

Ex. 7 at 5).  It modeled the draft lease agreement on a similar contract executed by

the City of Allentown, Pennsylvania, a transaction in which McNees was "heavily

involved."  (Tr. 60:10-14; Correll Aff. ¶ 12; Kapenstein Aff. ¶ 5).  Over the summer

months, three qualified prospective bidders submitted comments to the Borough on

multiple iterations of the draft lease agreement.  (Correll Aff. ¶ 14; Kapenstein Aff.

¶ 6; M.W. Ex. 7 at 5).

Early draft language set the water sales shortfall threshold at 480,000 gallons

per day, or approximately 75% of 2013 average daily volume sales to all consumers.

(Kapenstein ¶ 15; M.W. Ex. 2 at 6).  On August 27, 2014, SUEZ asked the Borough to

increase the threshold to 608,000 gallons per day, or approximately 95% of the 2013

total sales.  (Kapenstein ¶ 16).  The following day, a second prospective bidder

sought to increase the threshold to 577,225 gallons per day.  (Id. ¶ 17).  SUEZ

submitted redlined edits to the lease agreement to McNees by email dated

September 3, 2014.  (M.W. Ex. 2).  Therein, SUEZ edited the shortfall recovery

amount to include retail sewer customers and altered the water sales shortfall

formula to measure the "actual average daily volume of metered water sales to all Retail Water Customers," plus any bulk sales surplus, against "100[]% of 2013 Average Daily Volume sales to all Customers."[4] (Id. at 5-6).

McNees attorney Michael Jarman ("Attorney Jarman") responded that "2013 was an abnormal year." (Id. at 2). SUEZ stated that it "[could not] accept undue risk on volume" and encouraged Attorney Jarman to "explain the issue to [his] client." (Id. at 1; see also Tr. 94:3-7). On September 3, 2014, the Borough incorporated SUEZ's proposed changes, sent earlier that same day, and circulated a "Final Draft" lease agreement and accompanying memorandum. (Tr. 44:13-24; Correll Aff. ¶¶ 16-17; Kapenstein Aff. ¶ 21; see also M.W. Ex. 2 at 1). The memorandum described alterations to the shortfall recovery amount and water sales shortfall provisions as "substantial changes to the economic terms of the [lease agreement]." (M.W. Ex. 3 at 2-3). Middletown Water submitted the sole bid on the final draft lease agreement in late September 2014.[5] (See Correll Aff. ¶ 18; Kapenstein Aff. ¶ 25).

At a town council meeting on September 29, 2014, Councilman Kapenstein made a comprehensive presentation on contract negotiations, the bid process, and

_____

[4] This portion of the water sales shortfall calculation—"100[]% of 2013 Average Daily Volume sales to all Customers"—was calculated to be approximately 639,340 gallons per day. (M.W. Ex. 1 at 29). The five-year average of daily water use by volume from 2009 to 2013 is approximately 7,000 gallons less than the 2013 average daily water use quantity (retail and bulk) utilized in the final draft lease agreement. (See Doc. 33-2 at 2-11).

[5] The remaining qualified prospective concessionaires declined to place a bid out of concern that "there were too many restrictions and controls in the process that they did not think they would make any money." (M.W. Ex. 8 at 1).

the final draft lease agreement.  (M.W. Ex. 8 at 2-3).  He poignantly noted that the Borough could execute the lease agreement with Middletown Water or raise electric rates or taxes as much as 37% to address the Borough's financial challenges.  (Id. at 2; Tr. 42:21-43:4, 68:5-69:2, 73:8-17).  In supporting execution of the lease agreement, Councilman Kapenstein represented that he had done "the necessary due diligence."  (M.W. Ex. 8 at 3).  Mayor James Curry ("Mayor Curry") described the decision facing the Borough as a choice between "the lesser of two evils" and noted that leasing the system is the "best [solution] at this time."  (Id. at 6; Tr. 69:14-21).  Neither Mayor Curry nor Councilman Kapenstein participated in negotiations of the lease agreement that predated the September 29, 2014 meeting.  (Tr. 43:16-22, 70:20-22, 73:20-74:1).  The Borough awarded the lease agreement to Middletown Water in exchange for an upfront payment of $43 million and annual payments totaling $45 million over the 50-year term.  (See Correll Aff. ¶ 8; Kapenstein Aff. ¶ 25; see also M.W. Ex. 1 at 33).

**B.  Water Sales Shortfall**

Middletown Water assumed control of the water and sewer system effective January 1, 2015.  (M.W. Ex. 8 at 2).  The parties convened monthly operations committee meetings and Middletown Water provided monthly operations reports.  (See M.W. Exs. 24-30, 33-43; Tr. 26:18-24, 78:20-79:10, 82:7-12).  Borough manager Kenneth Klinepeter ("Klinepeter"), accompanied by counsel, represented the Borough at these meetings.  (Tr. 79:14-21).  Each monthly operations report included Middletown Water's calculation of the water sales shortfall and an explanation of said calculation.  (See M.W. Ex. 24 at 15; M.W. Ex. 25 at 14; M.W.

Ex. 26 at 14; M.W. Ex. 27 at 14; M.W. Ex. 28 at 15; M.W. Ex. 29 at 15; M.W. Ex. 30 at 16; Tr. 26:25-27:2, 28:21-29:3; 82:7-12; 84:17-85:6).  Through late 2017, the Borough expressed no concerns regarding these monthly reports or the lease agreement's water sales shortfall provisions.  (Tr. 29:10-24, 49:3-50:15, 85:7-10).

Middletown Water notified the Borough in late 2017 that a water sales shortfall occurred during the three-year test period of 2015 through 2017.  (M.W. Ex. 31).  The shortfall recovery amount for this three-year period was approximately $1.9 million which resulted in an annual shortfall recovery amount of approximately $640,000.  (M.W. Ex. 31 at 5).  On March 28, 2018, Middletown Water notified Borough consumers that an 11.5% monthly service charge on the total water and sewer bill would be assessed beginning in April 2018.  (See, e.g., Boro. Ex. 1).

### C. Meter Deficiencies

Meanwhile, the parties engaged in several disputes resulting in an arbitration proceeding.  Middletown Water commenced arbitration on March 20, 2018 concerning a "Major Capital Improvement" to the utility system.  (Doc. 1-2 at 201-06).  More significant to the matter *sub judice*, the Borough filed a counterclaim challenging Middletown Water's imposition of the service charge based upon substantial problems with Borough water meters, which purportedly impacted calculation of the water sales shortfall for the 2015-2017 test period.  (Id. at 206-07). The Borough requests the court enjoin imposition of the service charge pending arbitration on the grounds that the data used to calculate the water sales shortfall is unreliable.  (Doc. 7 at 13).

It is undisputed that certain meter malfunctioning resulted resulted in non-revenue water.[6] The Borough maintains that the quantity of non-revenue water during the 2015-2017 test period is a substantial cause of the water sales shortfall. (See Doc. 1-2 at 207-08; see also Doc. 7 at 13-14). These meter deficiencies included unmetered fire service lines to building sprinkler systems, uninvestigated and unrepaired idle and stopped meters,[7] malfunctions in large compound meters, and missing backflow prevention devices. (Id. at 207-08; Klinepeter Aff. ¶¶ 9-10).

Non-revenue water averaged between approximately 155,000 and 300,000 gallons per day from 2009 through 2014. (See Doc. 33-2 at 2-13). After Middletown Water assumed control of the Borough's water and sewer system, non-revenue water spiked in 2015 and then returned to pre-lease agreement levels. (Tr. 20:14-21:5; M.W. Ex. 43 at 2; M.W. Exs. 33, 35-42). Middletown Water identified various sources of non-revenue water and conducted maintenance to address the meter deficiencies throughout the 2015-2017 test period. (See, e.g., M.W. Ex. 34 at 3; M.W. Ex. 35 at 4; M.W. Ex. 36 at 4). The Borough adduced little evidence supporting the existence of *prevalent* deficiencies in large compound meters or Middletown Water's failure to investigate and repair large quantities of idle or stopped meters. (Compare Tr. 15:15-17:9, 17:14-18:11 with id. at 9:18-10:24 and Boro. Ex. 4 at 12-24; compare also Boro. Ex. 3 and Tr. 18:21-19:16 with Tr. 8:1-14-9:15). During the 2015-

---

[6] Non-revenue water is water provided to a customer that is unaccounted for because the meter failed to detect it. (Tr. 20:14-21:2).

[7] An idle meter is a working meter with no water flow. (Tr. 18:18-19). A stopped meter is a meter that fails to register water that flows through it. (Id. at 18:19-21).

2017 test period, Middletown Water identified five fire service lines that lacked backflow prevention devices or meters, resulting in non-revenue water. (<u>See</u> M.W. Ex. 43 at 2; Klinepeter Aff. ¶ 9).

## II.    <u>Legal Standard</u>

The court applies a four-factor test in determining the propriety of preliminary injunctive relief. The movant must, as a threshold matter, establish the two "most critical" factors: likelihood of success on the merits and irreparable harm. <u>Reilly v. City of Harrisburg</u>, 858 F.3d 173, 179 (3d Cir. 2017). Under the first factor, the movant must show that "it can win on the merits." <u>Id.</u> This showing must be "significantly better than negligible but not necessarily more likely than not." <u>Id.</u> The second factor carries a slightly enhanced burden: the movant must establish that it is "more likely than not" to suffer irreparable harm absent the requested relief. <u>Id.</u> Only if these "gateway factors" are satisfied may the court consider the third and fourth factors: the potential for harm to others if relief is granted, and whether the public interest favors injunctive relief. <u>Id.</u> at 176, 179. The court must then balance all four factors to determine, in its discretion, whether the circumstances favor injunctive relief. <u>Id.</u> at 179.

District courts may grant injunctive relief in an arbitrable dispute "provided that the traditional prerequisites for such relief are satisfied." <u>Gray Holdco, Inc. v. Cassady</u>, 654 F.3d 444, 453 (3d Cir. 2011) (quoting <u>Ortho Pharm. Corp. v. Amgen, Inc.</u>, 882 F.2d 806, 812 (3d Cir. 1989)). A party seeking injunctive relief must still satisfy the four-factor test for determining the propriety of such relief. <u>See</u> <u>Ortho</u>, 882 F.2d at 812-13.

**III.** **Discussion**

To establish a likelihood of success on the merits, a movant must produce sufficient evidence to satisfy the essential elements of the underlying cause of action. See Punnett v. Carter, 621 F.2d 578, 582-83 (3d Cir. 1980). We must examine the legal principles controlling the claim and the potential defenses available to the opposing party. See BP Chems. Ltd. v. Formosa Chem. & Fibre Corp., 229 F.3d 254, 264 (3d Cir. 2000). A mere possibility that the claim might be defeated does not preclude a finding of probable success if evidence clearly satisfies the essential prerequisites of the cause of action. Highmark, Inc. v. UPMC Health Plan, Inc., 276 F.3d 160, 173 (3d Cir. 2001). A showing that is "significantly better than negligible but not necessarily more likely than not" is sufficient to obtain preliminary injunctive relief. Reilly, 858 F.3d at 179. The requisite strength of a claim on the merits depends ultimately on the balance of the harms: "the more net harm an injunction can prevent, the weaker the plaintiff's claim on the merits can be while still supporting some preliminary relief." Id.

The Borough moves the court to enjoin imposition of the service charge pending resolution of both the instant litigation and the arbitration proceeding. We will address the likelihood of success on the merits of the Borough's claims *seriatim*.

**A.** **Likelihood of Success on the Merits: Contract Reformation**

Courts may reform a written instrument so it conforms to the parties' understanding following a showing of fraud, accident, or mistake. Regions Mortg., Inc. v. Muthler, 889 A.2d 39, 41 (Pa. 2005) (citation omitted). Contract reformation "presupposes that a valid contract between the parties was created but, for some

reason, was not properly reflected in the instrument that memorialize[d] the agreement." Bank of N.Y. v. Bates, No. 3:13-CV-0690, 2015 WL 1443282, at *8 (M.D. Pa. Mar. 30, 2015) (quoting H. Prang Trucking Co. v. Local Union No. 469, 613 F.2d 1235, 1239 (3d Cir. 1980)). Reformation is an equitable remedy that is "sparingly granted." H. Prang, 613 F.2d at 1239. The Borough premises its reformation claim on theories of mutual and unilateral mistake. (Doc. 7 at 5).

### 1. *Mutual Mistake*

A party seeking reformation of a contract based on mutual mistake must demonstrate that "both parties to [the] contract [were] mistaken as to existing facts at the time of execution" by evidence that is "clear, precise[,] and convincing." Bates, 2015 WL 1443282, at *8 (quoting Zurich Am. Ins. Co. v. O'Hanlon, 968 A.2d 765, 770 (Pa. Super. Ct. 2009)); see also Butcher v. Gen. Motors Co., No. 2:14-CV-00353, 2015 WL 867797, at *3 (W.D. Pa. Feb. 27, 2015). To satisfy this standard, Pennsylvania law requires the moving party to adduce evidence by "two witnesses, or one witness and corroborating circumstances." In re Mihordin, 162 A.3d 1166, 1172 (Pa. Super. Ct. 2017), reargument denied (July 28, 2017), appeal denied sub nom. In re Tr. of Mihordin, 180 A.3d 1212 (Pa. 2018) (quoting Easton v. Washington Cty. Ins. Co., 137 A.2d 332, 337 (Pa. 1957)). The moving party "must establish in the clearest manner that the intention proffered as the basis for reformation . . . existed and continued concurrently in the minds of the parties." Emp'rs Fire Ins. Co. v. Alvarado, No. 02-CV-6567, 2005 WL 182717, at *5 (E.D. Pa. Jan. 27, 2005) (quoting Dudash v. Dudash, 460 A.2d 323, 326-27 (Pa. Super. Ct. 1983)).

The court may reform a contract entered into under mutual mistake if (1) the identified mistake concerns an "essential fact" which induced the parties to contract and (2) the court is able to place the parties "in their former position[s]" as pertains the contract's subject-matter. Murray v. Willistown Twp., 169 A.3d 84, 90 (Pa. Sup. Ct. 2017) (citations and internal quotations omitted). Both parties need not recognize the existence of a mistake. In re Leach, No. 10-CV-449, 2010 WL 3038794, at *3 (W.D. Pa. July 30, 2010). A court may consider "the subject matter, the apparent object or purpose of the parties[,] and the conditions existing when the instrument was executed" to determine whether mutual mistake exists. Id. (citing Yuscavage v. Hamlin, 137 A.2d 242, 244 (Pa. 1958); Daddona v. Thorpe, 749 A.2d 475, 487 (Pa. Super. Ct. 2000)). A party may introduce parol evidence to demonstrate the existence of mutual mistake. Bates, 2015 WL 1443282, at *9.

The Borough suggests that the parties intended to design a lease agreement that balanced rate stability and predictability in rate increases for resident water consumers with Middletown Water's need for protection against undue risk of a water sales shortfall. (Doc. 7 at 8-9). According to the Borough, the parties misunderstood the water sales shortfall provisions as accomplishing that goal, when in actuality, the provisions create a permanent windfall for Middletown Water over the life of the lease agreement. (Id. at 9).

The present record does not establish that the parties jointly intended to effectuate the Borough's requested reforms in the lease agreement. The Borough seeks reformation of the lease agreement to measure the water sales shortfall by a comparison of the actual retail water sales only, plus any bulk water sales surplus,

against a threshold representing actual 2013 sales data for only retail water customers. (Doc. 45 at 39). It further seeks to exclude from the shortfall recovery amount any lost revenues associated with sewer rates. (Id.) SUEZ's redlined edits to the draft lease agreement on September 3, 2014 expressly requested terms contrary to the Borough's suggested reformation. (M.W. Ex. 2). The formula for calculating a water sales shortfall was edited to measure the "actual average daily volume of metered water sales to all Retail Water Customers," plus any bulk sales surplus, against "100[]% of 2013 Average Daily Volume sales to all Customers." (Id. at 6). And the shortfall recovery amount was edited to include retail sewer customers. (Id. at 5).

McNees attorneys initially resisted the proffered edits, noting that "2013 was an abnormal year." (Id. at 2). SUEZ stood by the proposed changes, noting it "[could not] accept undue risk on volume." (Id. at 1). Through counsel, the Borough incorporated the proposed changes and circulated a final draft lease agreement and accompanying memorandum on September 3, 2014, the same day SUEZ provided the redlined lease agreement. (Tr. 44:13-24; Correll Aff. ¶¶ 16-17; M.W. Ex. 3). In the memorandum, Attorney Jarman described the alterations to the shortfall recovery and water sales shortfall provisions as "substantial changes to the economic terms of the [lease agreement]." (M.W. Ex. 3 at 2-3). This record simply does not establish that the Borough or Middletown Water misunderstood these provisions' meaning or effect or that the parties ever intended to adopt the Borough's requested reforms.

The Borough produced no witnesses capable of speaking to Middletown Water's contracting intent or its understanding of the water sales shortfall

provisions. Klinepeter testified that he "never had any involvement with the negotiation of the concession agreement." (Tr. 25:6-15, 26:12-17, 33:13-15). He left the Borough's employment in August 2014, before Middletown Water proposed alterations to the relevant lease provisions. (Klinepeter Aff. ¶¶ 2-4; M.W. Ex. 2 at 1-2; Tr. 24:22-25:5). Mayor Curry and Councilman Kapenstein served as elected officials during the 2014 bidding process, but both testified that they did not participate in the contractual negotiations of the lease agreement. (Tr. 43:16-22, 70:20-22, 73:20-74:1). Hence, the testimony of Klinepeter, Mayor Curry, and Councilman Kapenstein establishes neither Middletown Water's contracting intent, nor the existence of mutual mistake.

Accordingly, the Borough has not established a likelihood of success on the merits of its claim for contract reformation premised on mutual mistake.

### 2. *Unilateral Mistake*

Unilateral mistake arises due to the negligence of the party acting under the mistake. Bates, 2015 WL 1443282, at *13 (quoting Roth v. Old Guard Ins. Co., 850 A.2d 651, 653 (Pa. Super. Ct. 2004)). A party seeking reformation based on unilateral mistake must demonstrate either (1) "mistake on one side and fraud on the other," A.P. Pino & Assocs., Inc. v. Utica Mut. Ins. Co., No. 11-CV-3962, 2012 WL 2567093, at *6 (E.D. Pa. July 3, 2012) (citation omitted), or (2) that the party against whom reformation is sought knew of the mistake so as to "justify an inference of fraud or bad faith," Bates, 2015 WL 1443282, at *13 (quoting United Nat'l Ins. Co. v. Indian Harbor Ins. Co., No. 14-CV-6425, 2015 WL 437630, at *10 (E.D. Pa. Feb. 2, 2015)); Regions Mortg., 889 A.2d at 41.

The court has already observed *supra* that the present record does not establish any mistake in contracting by the Borough. Attorneys for the Borough understood and even resisted Middletown Water's proposed edits but eventually capitulated. (See M.W. Ex. 2 at 2; M.W. Ex. 3 at 2-3; Correll Aff. ¶¶ 16-17). Assuming *arguendo* that the Borough could establish its unilateral mistake, it adduced no evidence that Middletown Water acted fraudulently or in bad faith. The Borough and Middletown Water are sophisticated parties, with "substantial business experience," that negotiated in plain view and at arm's length. (M.W. Ex. 1 at 144). The lease agreement acknowledges that both parties were "fully acquainted with the provisions" therein at the time of execution. (Id.; see also M.W. Ex. 8 at 3). The Borough retained attorneys who were experienced in contractual negotiations of this nature. (Tr. 30:11-20, 34:21-23, 43:23-44:2; Kapenstein Aff. ¶ 5; Correll Aff. ¶ 12).

The instant record reflects that the Borough comprehended the potential risks and rewards throughout negotiations. SUEZ provided its proposed edits to the at-issue provisions to counsel for the Borough and explicitly encouraged Attorney Jarman to explain the edits and the reason for including them to his client. (M.W. Ex. 2; see also Tr. 94:3-7). Councilman Kapenstein represented to Borough residents at a town council meeting that he had done "the necessary due diligence" and supported the final draft lease agreement. (M.W. Ex. 8 at 3). Mayor Curry understood that the Borough faced a difficult choice between "the lesser of two evils" and stated that entering the lease agreement with Middletown Water was the "best [solution] at this time." (Id. at 6; Tr. 69:14-21).

Following execution of the lease agreement, the Borough possessed the necessary information to realize there might be a problem with the at-issue provisions. The Borough and its counsel received an operations report from Middletown Water at each monthly operations meeting beginning in January 2015. (See M.W. Exs. 24-30, 33-43; Tr. 26:18-24, 78:20-79:10, 79:14-21, 82:7-12). The monthly reports consistently and clearly depicted data warning the Borough of a water sales shortfall at the end of the first three-year test period. (See M.W. Ex. 24 at 15; M.W. Ex. 25 at 14; M.W. Ex. 26 at 14; M.W. Ex. 27 at 14; M.W. Ex. 28 at 15; M.W. Ex. 29 at 15; M.W. Ex. 30 at 16; Tr. 26:25-27:2, 28:21-29:3; 82:7-12; 84:17-85:6). On this record, we cannot find that Middletown Water acted in any manner suggestive of fraud or bad faith.

**B.    Likelihood of Success on the Merits: Meter Deficiencies**

The Borough also seeks injunctive relief pending resolution of its meter deficiency counterclaim raised in a concurrent arbitration proceeding. (Doc. 45 ¶¶ 141-50; Doc. 1-2 at 206-08; Doc. 7 at 13-14; Tr. 21:8-10, 24:10-21). It asserts that Middletown Water's failure to address meter issues impacted calculation of the water sales shortfall and shortfall recovery amount. (Doc. 7 at 12-14). These meter deficiencies allegedly include, *inter alia*, malfunctions in several large compound meters, unmetered fire service lines to building sprinklers, and idle meters that report zero water flow to particular consumers. (Klinepeter Aff. ¶¶ 9-10). The Borough adduced some evidence of water meter deficiencies, but not enough to establish said deficiencies were so pervasive or severe that they significantly impacted calculation of the water sales shortfall and shortfall recovery amount.

Klinepeter testified that non-revenue water increased since Middletown Water began managing the water and sewer system. (Tr. 20:14-21:5). Minutes from a November 30, 2017 operations meeting reflect that non-revenue water data for 2015 through 2017 was "consistent [with] 2009-2011" data but did increase for a period of time in 2015. (M.W. Ex. 43 at 2). The increase was ascribed to transition of water services from the Borough to Middletown Water, "flushing associated with the Main St project," and a "high number of main breaks caused by Doli's illicit operation of system valves." (Id.; see also M.W. Exs. 33, 35-42). Operations meeting minutes from 2015 to 2017 reflect that Middletown Water promptly responded whenever issues arose: identifying specific sources of non-revenue water, planning restorative maintenance, and reporting when issues were resolved. (See, e.g., M.W. Ex. 34 at 3; M.W. Ex. 35 at 4; M.W. Ex. 36 at 4). Middletown Water acknowledges five fire service lines that lacked backflow prevention devices or meters, resulting in non-revenue water. (M.W. Ex. 43 at 2; Klinepeter Aff. ¶ 9). Despite this limited finding of non-revenue water, the record reflects normal challenges associated with the operation and maintenance of a water and sewer system and is not suggestive of widespread, unexplainable meter deficiencies.

As to large compound meters, a Middletown Water employee informed Klinepeter of purported meter performance issues when Klinepeter commenced employment with Middletown Water in September 2015. (Tr. 15:2-14). The employee identified meter issues at the Essex House, an east end warehouse complex, and a student housing project. (Id. at 17:14-18:11). The Borough offered

no evidence to corroborate the employee's claims or to expound on the scope of each of these alleged meter deficiencies.

Klinepeter also testified that a fire assembly meter at the Frey Village retirement home failed to record water usage for approximately ten months due to contractor error. (Id. at 15:15-17:1). He opined that approximately four million gallons of water went unrecorded during that period of time. (Id. at 17:2-9). No record evidence corroborates Klinepeter's unrecorded water estimate for Frey Village. *Per contra*, billing statements from October 2015 to October 2016 reflect that Middletown Water charged Frey Village estimated usage rates derived from historical consumption volumes. (See Boro. Ex. 4 at 12-24). Standish clarified that a Frey Village mechanic "tampered with the meter" and it took Middletown Water several months to acquire replacement parts. (Tr. 9:18-10:24). Moreover, even if the four million gallons of water purportedly lost by the damaged Frey Village meter were factored into the shortfall recovery amount calculation, this lost water would only reduce the three-year, $1.9 million shortfall by approximately $91,000, or less than 5%. (See M.W. Ex. 1 at 25; M.W. Ex. 32 at 4-5; see also Doc. 35 ¶ 102).

The Borough avers that Middletown Water has not diligently investigated "idle" and "stopped meter" reports. (Klinepeter Aff. ¶ 10). It contends that, if a home with an idle or stopped meter appears vacant, Middletown Water maintenance workers assume the location is in fact vacant and fail to further investigate any possible sources of flowing water. (Tr. 18:21-19:16). In support of this claim, the Borough provides only one service order for the Oak Hill Park meter which registered no usage for more than one year. (Boro. Ex. 3). After

acknowledging the Oak Hill Park meter issue, Standish could not recall other examples of prolonged meter deficiencies since Middletown Water assumed control of the Borough's water and sewer system. (Tr. 8:1-14). Standish testified that when a meter clogs or ceases to perform properly, the system flags the meter for low consumption and Middletown Water repairs it. (Id. at 8:22-9:6). He further noted that Middletown Water will assess an estimated charge to a consumer with a faulty meter based on historic consumption at that address. (Id. at 9:8-15; see e.g., Boro. Ex. 4 at 12-24).

For the limited purpose of obtaining preliminary injunctive relief, the Borough has failed to provide sufficient evidence that the quantity of meter deficiencies, if corrected, would appreciably affect the calculated shortfall recovery amount. Accordingly, the Borough has not adequately demonstrated a reasonable probability of success on the merits of its arbitration claim.

### C. Irreparable Harm

Irreparable injury is harm of such an irreversible character that prospective judgment would be "inadequate" to make the moving party whole. See Anderson v. Davila, 125 F.3d 148, 163 (3d Cir. 1997); Instant Air Freight Co. v. C.F. Air Freight, Inc., 882 F.2d 797, 801 (3d Cir. 1989). Mere risk of injury is not sufficient to meet this standard. Rather, the moving party must establish that the harm is imminent and probable. Anderson, 125 F.3d at 164. Harm that may be contained effectively only through immediate injunctive relief is properly deemed "irreparable." Instant Air Freight, 882 F.2d at 801. The required showings on irreparable harm and likelihood of success are correlative: thus, the weaker a plaintiff's merits showing, the more is

required of the showing of irreparable harm, and vice versa.  See Reilly, 858 F.3d at 179 (quoting Hoosier Energy Rural Elec. Coop., Inc. v. John Hancock Life Ins. Co., 582 F.3d 721, 725 (7th Cir. 2009) (Easterbrook, J.)).  The availability of money damages for an alleged injury will typically "preclude a finding of irreparable harm."  Id. at 177 (citing Frank's GMC Truck Center, Inc. v. Gen. Motors Corp., 847 F.2d 100, 102 n.3 (3d Cir. 1988)).

There is insufficient evidence to conclude that the prospective harm *sub judice* cannot be compensated through a monetary award.  Mayor Curry asseverates that the impact of this water service charge will be devastating on the Borough's residents and businesses.  (Tr. 63:21-23, 64:5-7).  He described the Borough as a "working class town" and noted that many residents are sensitive to price increases due to their socioeconomic situation.  (Id. at 63:23-64:3; see also Klinepeter Aff. ¶¶ 24-25).  The Borough claims that residents and businesses may choose to leave, causing a loss of tax revenue and further rate increases due to depressed water sales.  (Klinepeter Aff. ¶¶ 26, 28-30; Tr. 22:16-23:4, 64:5-7).  The court is not unsympathetic to the increased financial burden that will be borne by Borough consumers, but such losses may be addressed through an award of money damages provided, of course, that the Borough is ultimately successful on the merits of its claims.

The proffered harm to the Borough and its residents and businesses is also not immediate.  Middletown Water announced the rate increases would take effect in April 2018.  (Klinepeter Aff. ¶¶ 18-19).  The Borough speculates that businesses and "[s]ome residents could be forced to move out" and others will choose not to

move to Middletown "if it gains a reputation for unreasonably high water and sewer rates." (Id. ¶¶ 26-28). In support of this argument, the Borough points to a handful of social media posts by frustrated residents but otherwise offers no corroboration that businesses will be forced to leave Middletown. (Id. at Ex. A). The court concludes that the Borough has failed to show that it will more likely than not suffer immediate, irreparable harm absent the requested relief.[8]

## IV. Conclusion

Preliminary injunctive relief is an "extraordinary" remedy which should issue only in limited circumstances. AT&T v. Winback & Conserve Program, Inc., 42 F.3d 1421, 1426-27 (3d Cir. 1994); see also FED. R. CIV. P. 65. We do not find that the present circumstance warrants this extraordinary remedy.

/S/ CHRISTOPHER C. CONNER
Christopher C. Conner, Chief Judge
United States District Court
Middle District of Pennsylvania

Dated:    July 19, 2018

---

[8] The court need not address either of the two remaining factors—the potential for harm to others if relief is granted and whether the public interest favors injunctive relief—because the Borough has not satisfied either of the gateway factors. Reilly, 858 F.3d at 176, 179.