# IN THE UNITED STATES DISTRICT COURT
# FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| **MIDDLETOWN BOROUGH,** | : | CIVIL ACTION NO. 1:18-CV-861 |
| Plaintiff | : | (Chief Judge Conner) |
| v. | : | |
| **MIDDLETOWN WATER JOINT VENTURE LLC,** | : | |
| Defendant | : | |

## MEMORANDUM

Plaintiff Middletown Borough ("the Borough") commenced this action seeking reformation of its water and sewer services contract with defendant Middletown Water Joint Venture LLC ("Middletown Water"). Middletown Water moves to dismiss the Borough's amended complaint pursuant to Federal Rule of Civil Procedure 12(b)(6). (Doc. 56).

### I. Factual Background & Procedural History

The Borough and Middletown Water are parties to a Municipal Water and Wastewater Utility System Concession and Lease Agreement ("lease agreement").[1] (Doc. 45 ¶¶ 3-4; Doc. 45-1 at 2, 155-56). Under the lease agreement, Middletown Water provided financial consideration (both at signing and throughout the term of

---

[1] The Borough is a successor-in-interest to the Middletown Borough Authority, a signatory to the lease agreement. (Doc. 45 ¶ 4; Doc. 45-1 at 2). In 2014, a private equity firm and United Water formed the joint venture Middletown Water for the purpose of entering into the lease agreement. (Doc. 45 ¶¶ 3, 8). United Water is now known as Suez North America. (Id. ¶ 3). For clarity, the court will reference Middletown Water when discussing any actions taken by United Water or Suez North America during the contracting process.

the agreement) in exchange for the right to operate the Borough's water and sewer system and to revenues generated therefrom. (Doc. 45 ¶ 11). The term of the lease agreement is 50 years. (Id.)

Article 7 of the lease agreement governs imposition of service charges for water and sewer services. (Id. ¶ 14). Middletown Water could not increase water and sewer rates prior to January 2019 without Borough approval. (Id. ¶ 15; Doc. 45-1 at 83)). The lease agreement regulates the "Permitted Annual Rate Adjustment" post-January 2019 by tying rate increases to the "Margin Change" as defined in the lease agreement, as well as the Consumer Price Index. (Doc. 45 ¶ 16; see Doc. 45-1 at 11, 21-22, 26, 28, 83-84). Section 7.1 enumerates several exceptions to the above-described strictures on rate increases, including the following:

> (*l*) *Demand Shortfall Recovery.* [Middletown Water] may also impose upon all Retail Water Customers and Retail Sewer Customers a Service Charge in any Demand Shortfall Recovery Year to recover the Annual Shortfall Recovery Amount that may be recovered in that Demand Shortfall Recovery Year, which Service Charge shall be in addition to the Service Charges otherwise imposed under Section 7.1.

(Doc. 45-1 at 85; Doc. 45 ¶¶ 19-20). A demand shortfall recovery year is any of the three years following the final year of a three-year rolling test period in which there is a water sales shortfall. (Doc. 45-1 at 18, 36). "Reporting Years" 2015-2017 comprised the first three-year rolling test period under the lease agreement. (Id. at 36).

A water sales shortfall is measured by calculating the sum in gallons of (1) "the actual average daily volume of metered water sales to all Retail Water

2

Customers" over a three-year test period, and (2) the bulk sales surplus over the three-year test period; a shortfall occurs if the sum of these figures is less than 639,340 gallons per day. (Id. at 36; Doc. 45 ¶¶ 19, 23). A bulk sales surplus is the amount in gallons per day that the "actual average daily volume of metered water sales to all [Middletown bulk customers]" over a three-year test period exceeds 62,970 gallons.[2] (Doc. 45-1 at 13; Doc. 45 at 6 n.3). Middletown Water may impose a service charge when a water sales shortfall occurs to recover the annual shortfall recovery amount (one-third of the shortfall recovery amount for a three-year test period). (Doc. 45-1 at 11, 32, 85; Doc. 45 ¶ 21). The water sales shortfall, expressed in gallons per day, is used to calculate the three-year shortfall recovery amount. (Doc. 45-1 at 32). In a three-year test period, the shortfall recovery amount is the amount of money that Middletown Water would have collected from retail water and sewer customers "if an amount of water equal to the Water Sales Shortfall had been sold to Retail Water Customers." (Id.; Doc. 45 ¶ 22).

### A. Negotiation of the Lease Agreement

In 2014, the Borough initiated a competitive procurement process to lease its water and sewer system. (Doc. 45 ¶ 5). The Borough engaged a financial advisor and legal counsel to facilitate the procurement process. (Id. ¶ 6). After issuing a request for qualifications, three qualified prospective bidders expressed interest, including Middletown Water. (Id.; see id. ¶ 8). A preliminary draft of the lease

---

[2] The threshold volume of 62,970 gallon per day includes bulk water sales to customers in the neighboring Borough of Royalton. (Doc. 45 at 6 n.4).

agreement was circulated to the prospective bidders, each of whom had the opportunity to comment and request changes to the draft. (Id. ¶¶ 6-7).

Middletown Water's first markup of the draft lease agreement in July 2014 did not include changes to the water sales shortfall definition. (Id. ¶ 30). The second draft of the lease agreement defined the bulk sales surplus at 62,970 gallons per day (the actual 2013 bulk sales) and the water sales shortfall threshold at 480,000 gallons per day (75% of the 2013 average daily sales to all customers). (Id. ¶ 31). On August 27, 2014, Middletown Water requested that the Borough increase the water sales shortfall threshold to 608,000 gallons per day, or approximately 95% of the 2013 average daily bulk and retail sales. (Id. ¶ 33). The following day, another prospective bidder sought to increase the water sales shortfall to 577,225 gallons per day. (Id. ¶ 34).

On September 3, 2014, Middletown Water submitted two "last minute" substantive changes to the supposedly near-final draft. (Id. ¶¶ 35-36). Those changes were as follows: (1) inclusion in the shortfall recovery amount of both water *and sewer* revenues; and (2) measurement of any water sales shortfall by comparing the three-year average of retail water sales plus any bulk sales surplus against *100% of 2013 retail and bulk water sales by volume*. (Id. ¶ 36; Doc. 45-2 at 6-7). Borough counsel responded that 2013 was not a representative year because bulk water sales were approximately 20% higher than the five-year average that encompassed 2013. (Doc. 45 ¶ 37; see id. ¶ 78; Doc. 45-2 at 3). Middletown Water's representative replied in defense of the proposed changes that Middletown Water could not "accept undue risk on volume." (Doc. 45-2 at 2; Doc. 45 ¶ 38). The representative

4

stated that Middletown Water "understood the timeframe [counsel was] under" and asked that counsel explain the changes to the Borough. (Doc. 45-2 at 2).

Middletown Water transmitted a redlined version of the lease agreement, including proposed language implementing its requested changes, to the Borough's counsel by email at 5:16 p.m. on September 3, 2014. (Doc. 45 ¶ 39; Doc. 45-2 at 2, 6-7, 9). Approximately an hour later, counsel for the Borough circulated a redlined version of the lease agreement (including Middletown Water's changes) titled "Binding Offer" together with an explanatory memorandum to all prospective bidders. (Doc. 45 ¶¶ 41-42). The memorandum identified a list of "substantial changes to the economic terms of the [lease agreement]" including the proposed changes to the shortfall recovery amount and the water sales shortfall provisions. (Id. ¶ 43; Doc. 45-3 at 3-4). On September 18, 2014, Borough counsel disseminated another version of the lease agreement titled "Binding Proposal – Execution Copy," wherein the "[100% of 2013 Average Daily Volume sales] gallons per day" language was converted to "639,340 gallons per day" using data provided by Middletown Water and confirmed by Borough counsel. (Doc. 45 ¶ 44).

Middletown Water submitted the sole offer on the lease agreement. (Id. ¶¶ 8, 45). Between September 19 and September 29, 2014, the parties engaged in negotiations regarding, *inter alia*, Middletown Water's upfront payment, subsequent annual payments, and the annual rate caps following the four-year service charge freeze. (See id. ¶¶ 45-49). Middletown Water tendered a final offer of a $43 million upfront payment and annual payments thereafter of $750,000. (Id. ¶ 50).

5

The Borough convened a council meeting on September 29, 2014, to discuss and vote on Middletown Water's offer. (Id. ¶ 58). During the meeting's executive session, a member of the Borough council stated that the lease agreement "safe guard[s] utility rate payers now and in the future" and provides "annual rate caps in the contract." (Doc. 45 ¶ 58 (quoting Doc. 17-2 at 3)). The meeting minutes also reflect that there would be no service charge increases during the first four years of the agreement. (Id. (citing Doc. 17-2 at 6)). Middletown Water representatives attended this meeting, and the Borough alleges that those representatives made no effort to correct the council member's statements. (Id. ¶ 59). The Borough council voted to accept Middletown Water's bid, (Doc. 17-2 at 7), and the parties executed the lease agreement on September 30, 2014, (Doc. 45 ¶¶ 10, 52). The Borough now claims that it was unaware of the potential impact of Middletown Water's proposed changes throughout the lease agreement negotiation process. (Id. ¶¶ 51, 53-54, 64).

**B.  Shortfall Recovery**

Middletown Water assumed control of the Borough's water and sewer system effective January 1, 2015. (Id. ¶ 10). Water sales data for the first three-year test period (2015-2017) resulted in a water sales shortfall. (Id. ¶ 88). The corresponding shortfall recovery amount was $1.9 million. (Id.) In March and April of 2018, Middletown Water began assessing Borough residents an 11.5% surcharge on their water and sewer bills. (See id. ¶¶ 90, 92-94). The Borough objected to imposition of the surcharge. (Id. ¶ 116). Following mediation, the Borough initiated arbitration proceedings in part because of unaddressed meter deficiencies throughout the

water and sewer system which allegedly impacted calculation of the water sales shortfall. (Id. ¶¶ 116-19; see id. ¶¶ 102-04).

### C. Procedural History

The Borough filed this action in the Court of Common Pleas for Dauphin County, seeking injunctive relief and contract reformation. Middletown Water timely removed the case to this court. Following a May 22, 2018 preliminary injunction hearing, we denied the Borough's request for preliminary injunctive relief, concluding that the Borough had failed to show a likelihood of success on the merits or that it would suffer irreparable harm absent injunctive relief.

Middletown Water moved to dismiss the Borough's complaint, prompting the Borough to file an amended complaint on July 13, 2018. Therein, the Borough seeks reformation of the lease agreement in two ways. First, the Borough suggests removing 2013 bulk water sales from the baseline threshold for calculating a water sales shortfall. (Doc. 45 at 39). Second, the Borough posits that retail sewer customers should be excluded from the shortfall recovery amount formula. (Id.) Middletown Water now moves to dismiss the Borough's amended complaint. The motion is fully briefed and ripe for disposition.

## II. **Legal Standard**

Rule 12(b)(6) of the Federal Rules of Civil Procedure provides for the dismissal of complaints that fail to state a claim upon which relief may be granted. FED. R. CIV. P. 12(b)(6). When ruling on a motion to dismiss under Rule 12(b)(6), the court must "accept all factual allegations as true, construe the complaint in the light most favorable to the plaintiff, and determine whether, under any reasonable

7

reading of the complaint, the plaintiff may be entitled to relief." Phillips v. County of Allegheny, 515 F.3d 224, 233 (3d Cir. 2008) (quoting Pinker v. Roche Holdings, Ltd., 292 F.3d 361, 374 n.7 (3d Cir. 2002)). In addition to reviewing the facts contained in the complaint, the court may also consider "matters of public record, orders, exhibits attached to the complaint and items appearing in the record of the case." Mayer v. Belichick, 605 F.3d 223, 230 (3d Cir. 2010) (citing Pension Benefit Guar. Corp. v. White Consol. Indus., Inc., 998 F.2d 1192, 1196 (3d Cir. 1993)).

Federal notice and pleading rules require the complaint to provide "the defendant fair notice of what the . . . claim is and the grounds upon which it rests." Phillips, 515 F.3d at 232 (alteration in original) (quoting Bell Atl. Corp. v. Twombly, 550 U.S. 544, 555 (2007)). To test the sufficiency of the complaint, the court conducts a three-step inquiry. See Santiago v. Warminster Township, 629 F.3d 121, 130-31 (3d Cir. 2010). In the first step, "the court must 'tak[e] note of the elements a plaintiff must plead to state a claim.'" Id. at 130 (alteration in original) (quoting Ashcroft v. Iqbal, 556 U.S. 662, 675 (2009)). Next, the factual and legal elements of a claim must be separated; well-pleaded facts are accepted as true, while mere legal conclusions may be disregarded. Id. at 131-32; see Fowler v. UPMC Shadyside, 578 F.3d 203, 210-11 (3d Cir. 2009). Once the court isolates the well-pleaded factual allegations, it must determine whether they are sufficient to show a "plausible claim for relief." Iqbal, 556 U.S. at 679 (citing Twombly, 550 U.S. at 556); Twombly, 550 U.S. at 556. A claim is facially plausible when the plaintiff pleads facts "that allow[] the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." Iqbal, 556 U.S. at 678.

8

**III. Discussion**

Courts may reform a written instrument so it conforms to the parties' understanding following a showing of fraud, accident, or mistake. Regions Mortg., Inc. v. Muthler, 889 A.2d 39, 41 (Pa. 2005) (citation omitted). Contract reformation "presupposes that a valid contract between the parties was created but, for some reason, was not properly reflected in the instrument that memorializes the agreement." Erie Telecomms., Inc. v. City of Erie, 853 F.2d 1084, 1091 (3d Cir. 1988) (quoting H. Prang Trucking Co. v. Local Union No. 469, 613 F.2d 1235, 1239 (3d Cir. 1980)). Reformation is an equitable remedy that is "sparingly granted." H. Prang Trucking Co., 613 F.2d at 1239. The Borough premises its contract reformation claim on theories of mutual and unilateral mistake.

**A. Contract Reformation: Mutual Mistake**

In Pennsylvania, mutual mistake "will afford a basis for reforming a contract." Zurich Am. Ins. Co. v. O'Hanlon, 968 A.2d 765, 770 (Pa. Super. Ct. 2009) (quoting Holmes v. Lankenau Hosp., 627 A.2d 763, 767 (Pa. Super. Ct. 1993)); see Consol. Rail Corp. v. Portlight, Inc., 188 F.3d 93, 96 (3d Cir. 1999); Bugen v. New York Life Ins. Co., 184 A.2d 499, 500-01 (Pa. 1962). Both parties to a contract must be "mistaken as to existing facts at the time of execution" of the contract for mutual mistake to exist. O'Hanlon, 968 A.2d at 770 (quoting Holmes, 627 A.2d at 767; Consol. Rail Corp., 188 F.3d at 96 (quoting Holt v. Dep't of Pub. Welfare, 678 A.2d 421, 423 (Pa. Commw. Ct. 1996)). The doctrine of mutual mistake will only apply where the mistake "(i) relates to the basis of the bargain; (ii) materially affects the parties' performance; and (iii) is not one as to which the injured party bears the

9

risk." Consol. Rail Corp., 188 F.3d at 96 (citing Lanci v. Metro. Ins. Co., 564 A.2d 972, 974 (Pa. Super. Ct. 1989); RESTATEMENT (SECOND) OF CONTRACTS § 154 (AM. LAW. INST. 1981)).

Middletown Water insists that the Borough cannot maintain a claim for contract reformation premised on mutual mistake. We are constrained to agree. According to the Borough, the shortfall recovery amount and water sales shortfall provisions as currently written guarantee Middletown Water yearly windfall profits, rather than merely providing downside protection in the event that water sales drop so low as to threaten profitability of the lease agreement in a particular year. (Doc. 58 at 2). The Borough seeks to reform the lease agreement to (1) eliminate the 2013 bulk water sales from the baseline threshold for determining when a water sales shortfall occurs and (2) eliminate retail sewer customers from the shortfall recovery amount calculation. (Doc. 45 at 39).

The Borough's own allegations belie any finding of mutual mistake. The Borough alleges that Middletown Water was "well aware" that the proposed change to the water sales shortfall provision was "virtually certain to produce significant additional revenue and profit beginning in 2018" because it utilized bulk retail sales in a record high year as part of the measuring threshold. (Doc. 45 ¶ 61). The Borough specifically alleges that Middletown Water was "never mistaken or confused as to the meaning" of the water sales shortfall provision, (id. ¶ 62), and an employee of Middletown Water testified that it knew its proposed changes would "produce a shortfall absent an unprecedented growth in sales volume," (id. ¶ 63). The amended complaint ascribes misunderstanding to the Borough alone. (Id.

10

¶ 64).  Hence, the Borough has not alleged that the parties entered into the lease agreement based on a mutual mistake as to the shortfall provisions.

The amended complaint also sets forth facts indicating that the Borough bore the risk of any mutual mistake.  An injured party bears the risk of a mistake if either: (1) the parties agree that the injured party shall bear the risk; (2) the injured party treats its limited knowledge of facts to which the mistake relates as sufficient; or (3) the court reasonably allocates the risk to the injured party.  Step Plan Servs., Inc. v. Koresko, 12 A.3d 401, 411 (Pa. Super. Ct. 2010) (quoting RESTATEMENT (SECOND) OF CONTRACTS § 154 (AM. LAW. INST. 1981)).

Middletown Water requested on September 3, 2014, that the shortfall recovery amount provision be amended to include both water and wastewater revenues and that the water sales shortfall be measured against a baseline of 2013 total retail and bulk water sales.  (Doc. 45 ¶¶ 35-36).  Borough counsel initially pushed back by noting that 2013 was an "abnormal" year, (Doc. 45-2 at 3; Doc. 45 ¶ 37), but nonetheless circulated a redlined version of the lease agreement incorporating the requested changes less than an hour and a half after Middletown Water emailed the changes to counsel, (see Doc. 45 ¶¶ 39, 41).  The Borough acknowledges that it was unaware of the effects of the proposed changes.  (Id. ¶¶ 40, 64).

The Borough chose to adopt Middletown Water's edits based on cursory review and limited understanding of their impact.  Approximately two weeks later, the changes were memorialized in a draft of the lease agreement marked "Binding Proposal – Execution Copy."  (Id. ¶ 44).  The parties spent an additional week and a

11

half negotiating other aspects of the lease agreement, (see id. ¶¶ 45-48, 50, 52), but at no point between September 3 and the date the lease agreement was executed (September 30) did the Borough further investigate Middletown Water's proposed changes to the shortfall provisions, (see id. ¶¶ 35-36, 51-55). The Borough's conduct clearly establishes that it regarded its knowledge of the facts underlying the water sales shortfall changes as sufficient to sign the lease agreement. Moreover, because this candid acknowledgement stems from the Borough's own *allegata*, it is proper to allocate any risk of mistake to the Borough. For all of these reasons, the Borough has not adequately pled a claim for contract reformation based on mutual mistake.

### B. Contract Reformation: Unilateral Mistake

Unilateral mistake arises due to the negligence of the party acting under the mistake. See Roth v. Old Guard Ins. Co., 850 A.2d 651, 653 (Pa. Super. Ct. 2004); Kramer v. Schaeffer, 751 A.2d 241, 246 (Pa. Super. Ct. 2000) (citation omitted). In Pennsylvania, a unilateral mistake generally will not permit relief from a contract. Kramer, 751 A.2d at 246 (citation omitted). A party seeking reformation based on unilateral mistake must show that the party against whom reformation is sought "had 'such knowledge of the mistake as to justify an inference of fraud or bad faith.'" Regions Mortg., 889 A.2d at 42 (quoting Dudash v. Dudash, 460 A.2d 323, 327 (Pa. Super. Ct. 1983)); see Kramer, 751 A.2d at 246 (citation omitted). To obtain relief, the party seeking reformation must allege unilateral mistake and the actual intent of the parties. See Kramer, 751 A.2d at 246 (quoting Dudash, 460 A.2d at 327).

The Borough avers that it was "mistaken as to the impact that Middletown Water's revisions to the [water sales shortfall] provisions had on Borough

residents." (Doc. 58 at 11; see Doc. 45 ¶¶ 51, 53-54, 64). Notably, the Borough does not allege that it was mistaken as to the precise changes requested by Middletown Water or that it intended to exclude those changes from the lease agreement. (See Docs. 45, 58, 64). Taking the factual allegations in the amended complaint as true, counsel for the Borough failed to fully investigate Middletown Water's requested edits before incorporating them into the lease agreement even after initially expressing reservations. (See Doc. 45 ¶¶ 37, 39, 41-43; Doc. 45-3 at 3-4). The Borough claims that its counsel failed to comprehend "the economic significance of these changes" or explain their significance to the Borough. (Doc. 45 ¶ 43). And in signing the lease agreement, the Borough acknowledged that it had "substantial business experience and [was] fully acquainted with the provisions of th[e] Agreement." (Doc. 45-1 at 151). Any unilateral mistake in this case is the clear product of the Borough's negligence.

The Borough also fails to allege fraud or bad faith by Middletown Water. Federal Rule of Civil Procedure 9(b) requires a party alleging fraud or mistake "must state with particularity the circumstances constituting fraud or mistake." FED. R. CIV. P. 9(b). The Third Circuit has described this heightened pleading standard as requiring "the who, what, when, where[,] and how of the events at issue." See In re Suprema Specialties, Inc. Sec. Litig., 438 F.3d 256, 276 (3d Cir. 2006) (citations and internal quotation marks omitted). The strictures of Rule 9(b) "insure adequate notice so that defendants can intelligently respond," Ill. Nat'l Ins. Co. v. Wyndham Worldwide Operations, Inc., 653 F.3d 225, 233 (3d Cir. 2011) (citation omitted), and are not designed to "test the factual allegations of the claim,"

13

id. (quoting Morganroth & Morganroth v. Norris, McLaughlin & Marcus, P.C., 331 F.3d 406, 414 n.2 (3d Cir. 2003)). Conditions of a person's mind, including malice, intent, and knowledge, may be alleged generally. FED. R. CIV. P. 9(b).

The amended complaint does not support an inference of fraud. The Borough contends that Middletown Water misrepresented the nature of its proposed changes to the lease agreement by stating that such revisions were to protect against "undue risk on volume." (See Doc. 58 at 17; Doc. 45 ¶ 38; Doc. 45-2 at 2). But the Borough does not allege that Middletown Water's proffered reason for the changes was untrue, nor does it point to any blatantly false statements of fact by Middletown Water.³ (See Docs. 45, 58, 64). *Per contra*, Middletown Water explicitly outlined the proposed changes to the Borough in a redlined version of the agreement, (Doc. 45 ¶ 39, Doc. 45-2 at 4-9), and identified a number in gallons of the 2013 average daily volume of retail and bulk water sales reflecting the proposed changes, (Doc. 45 ¶ 44). This information was also publicly available. (See id. ¶ 78). Middletown Water expressly asked the Borough's counsel to explain the proposed changes to the Borough. (Doc. 45-2 at 2). Borough counsel understood that 2013 was "an abnormal year," (id. at 3; Doc. 45 ¶ 37), and possessed all the information

---

³ The Borough points to the testimony of a Middletown Water consultant as evidence of fraud. (See Doc. 45 ¶ 63). This consultant allegedly testified that Middletown Water "understood that the threshold that had been inserted into the Agreement would produce a shortfall absent an unprecedented growth in sales volume." (Id.) Assuming this is an accurate representation of the consultant's testimony, the statement at most supports that Middletown Water understood the possible implications of the proposed changes. It in no way suggests that Middletown Water withheld information from the Borough that prevented the Borough from reaching its own conclusion regarding the proposed changes.

necessary to determine the impact of Middletown Water's proposed changes. Contrary to the Borough's assertions, the amended complaint suggests that Middletown Water dealt at all times in an open and straightforward manner. The Borough has failed to plead with particularity facts constituting fraud.

The Borough asseverates that Middletown Water acted in bad faith by failing to correct the Borough's mistaken understanding of the lease agreement. (Doc. 58 at 18). At the September 29, 2014 meeting, a member of the Borough council stated that the lease agreement "safe guard[s] utility rate payers now and in the future" and provides "annual rate caps in the contract." (Doc. 45 ¶ 58 (quoting Doc. 17-2 at 3)). The meeting minutes also reflect the Borough's belief that under the lease agreement, there would be no rate increases during the first four years of the agreement. (Id. (citing Doc. 17-2 at 6)). The Borough alleges that Middletown Water representatives in attendance at that meeting failed to "contradict[] the Borough's public characterization of the intent of the Agreement." (Id. ¶ 59).

These statements were accurate representations of the lease agreement's terms. Section 7.1(d) of the lease agreement provides that, "[p]rior to January 2019 [Middletown Water] shall not revise the Schedule of Service Charges from the Initial Schedule of Rates in effect on the Closing Date" without Borough approval. (Doc. 45-1 at 83; Doc. 45 ¶ 15). After January 2019, yearly rate increases could not exceed the "Permitted Annual Rate Adjustment," defined by the lease agreement using the Consumer Price Index. (Doc. 45 ¶ 16; see Doc. 45-1 at 11, 21-22, 26, 28, 83-84). The council member's representations were in accord with these lease provisions. Middletown Water representatives were under no affirmative obligation

15

to qualify the Borough's assertions by noting that Section 7.1 sets forth multiple circumstances under which Middletown Water could impose surcharges including, *inter alia*, to recover the annual shortfall recovery amount in the event of a water sales shortfall. (Doc. 45-1 at 83-85; Doc. 45 ¶¶ 18-19). For all of these reasons, the Borough has failed to state a claim for contract reformation premised on unilateral mistake.

### IV. Conclusion

The court will grant Middletown Water's motion (Doc. 56) to dismiss the Borough's amended complaint. An appropriate order shall issue.

/S/ CHRISTOPHER C. CONNER
Christopher C. Conner, Chief Judge
United States District Court
Middle District of Pennsylvania

Dated: March 27, 2019